**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 49110**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | )   **Opinion Filed: September 20, 2023** |
|     Plaintiff-Respondent, | ) |
| | )   **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) |
| EMERSON CLYDE BUCK, IV, | ) |
| | ) |
|     Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Jason D. Scott, District Judge.

Judgment of conviction for first degree murder with a deadly weapon enhancement, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Andrea Reynolds, Deputy Appellate Public Defender and Jenny C. Swinford, Deputy Appellate Public Defender, Boise, for appellant. Jenny C. Swinford argued.

Hon. Raúl R. Labrador, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent. Mark W. Olson argued.

---

HUSKEY, Judge

Emerson Clyde Buck, IV (Emerson) appeals from his judgment of conviction after a jury found him guilty of first degree murder with a deadly weapon enhancement, Idaho Code §§ 18-4001, -4002, -4003, 19-2520, and misdemeanor resisting and obstructing, I.C. § 18-705. Emerson argues the district court erred in denying his challenge to the State's exercise of a peremptory challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986). He also argues the district court abused its discretion and violated his constitutional right to present a defense by limiting his cross-examination of a detective who investigated the murder and by limiting Emerson's closing argument. Finally, Emerson argues the accumulated evidentiary errors deprived him of a fair trial. The State argues the district court did not err, but even if the court did err, any error was harmless,

and Emerson is not entitled to relief based on cumulative error. The judgment of conviction is affirmed.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Emerson is the son of Emerson Clyde Buck, III (Clyde) and Norma Buck. Emerson lived with Clyde, Norma, and his paternal uncle, James Buck, in a very small, two-bedroom trailer. Emerson and James shared a bedroom that contained only one twin bed, which was available on a "first come, first served" basis; the person who did not get the bed slept on the couch in the living room. On January 18, 2020, James got the bed. Early in the morning on January 19, 2020, Norma was awakened by a loud voice coming from the bedroom; she recognized the voice as Emerson's and she heard Emerson yelling profanities, followed by three pounding noises. Norma ran to the bedroom and saw James lying on the bed and bleeding. Norma left the room and called 911. She went back to the bedroom, rolled James over, and observed a large gash in his neck. Norma was still on the telephone with dispatch when emergency medical services arrived; James was pronounced dead at the scene.

Clyde, Norma, and James were in the house when law enforcement arrived. Emerson was not in the house but his shoes, cell phone, and lighter were on a kitchen counter, close to a knife block from which Norma reported a knife missing. Law enforcement began looking for Emerson, who was found walking on a street approximately one-quarter mile from the trailer. When a law enforcement officer made eye contact with Emerson, he fled, but he was almost immediately arrested in a nearby field. At the time of his arrest, Emerson was wearing clothing that Norma did not recognize as his, and he had fresh cuts on his hands and drops of blood on his socks. Emerson was charged with first degree murder, enhanced for use of a deadly weapon, and resisting and obstructing an officer.

The case proceeded to trial. During voir dire, the defense raised a *Batson* challenge to one of the State's three peremptory strikes. After hearing argument, the district court found the State did not exercise its peremptory challenge with purposeful discrimination. During trial, experts testified that the blood on Emerson's socks contained James' DNA; based on the forensic evidence, Emerson was in the room when the murder occurred; the cuts on Emerson's hands were consistent with his hands slipping down the blade of a weapon; blood in the bedroom projected away from

2

the assailant during the attack; and the trail of blood droplets leading out the trailer's front door contained James' DNA.

After the State questioned Detective Thorndyke, the defense wished to cross-examine him about the breadth and scope of the investigation regarding other potential suspects. Although the defense acknowledged it did not have any evidence pointing to an alternate perpetrator and, thus, was not raising an alternate perpetrator defense, Emerson's counsel argued it was permitted to question the detective about whether he followed up on all possible leads, including leads related to two specific individuals. The State objected, arguing that without any evidence connecting the individuals to the crime, the evidence was not relevant, and even if it was relevant, it was more prejudicial than probative because it would confuse or mislead the jury. The district court sustained the State's objection and did not allow defense counsel to continue the line of questioning because the defense could not provide any evidence linking the individuals to the crime. However, defense counsel was permitted to inquire, generally, whether Det. Thorndyke followed up with other possible leads.

During closing argument, defense counsel attempted to argue that Emerson had been out doing his "appointed rounds and then went for a walk" at the time of the murder and that when Emerson left his house, his family members were all alive. The State objected that this argument contained facts not in evidence and was, essentially, an undisclosed alibi. The defense asserted that it was entitled to argue that Emerson was not home at the time of the murder and that even if the argument was an alibi, he was not required to disclose the alibi because he was not calling any witnesses in support of his argument. The district court granted the State's motion and held that alibis are required to be disclosed and because this alibi was not disclosed, the district court ordered the statement stricken. Defense counsel then rephrased his closing argument and told the jury that Emerson was "returning from a walk" at the time he was arrested.

Emerson was convicted of all counts and timely appeals.

## II.

## ANALYSIS

### A.    The District Court Did Not Err in Denying Emerson's *Batson* Challenge

Emerson argues the district court erred in denying his *Batson* challenge because the State violated his right to equal protection when it used a peremptory challenge to strike Juror 17, the only Black prospective juror, from the venire. Emerson argues the district court's finding that the

State did not strike Juror 17 with purposeful discrimination[1] is clearly erroneous because evidence of the State's purposeful discrimination is shown by the fact that the prosecutor used one of its three peremptory strikes to remove Juror 17, thus excluding "100 percent of the Black jurors." Emerson asserts other evidence of purposeful discrimination includes: (1) the prosecutor's use of its other two peremptory strikes to remove prospective jurors who opined or agreed that systemic racism exists; (2) the prosecutor did not strike similarly situated prospective jurors; and (3) the prosecutor questioned Juror 17 differently than other prospective jurors. In response, the State argues Emerson's claim fails because he failed to make a prima facie case for discriminatory intent, the State offered a race-neutral reason for the peremptory strike, and the district court's finding that the strike was not made with purposeful discrimination is not clearly erroneous.

A party violates the Equal Protection Clause of the Fourteenth Amendment by exercising a peremptory strike based on a prospective juror's race. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994); *Batson*, 476 U.S. at 96. When a party asserts such a violation occurred, the trial court uses a three-part burden-shifting framework to assess whether the challenged peremptory strike was based on an impermissible discriminatory motive. *See Batson*, 476 U.S. at 93-98. The first step of a *Batson* challenge requires the party asserting a violation to make a prima facie showing of two facts. First, the moving party must show that the challenged member of the venire is a member of a cognizable racial group." *Flowers v. Mississippi*, ___ U.S. ___, ___, 139 S. Ct. 2228, 2243 (2019). Cognizable racial groups "are those which have historically been subjected to discriminatory treatment and have from time-to-time required aid from the courts in securing equal treatment under the law." *State v. Foster*, 152 Idaho 88, 91, 266 P.3d 1193, 1196 (Ct. App. 2011). Second, the moving party must then show that the prosecutor exercised its peremptory challenge(s) with discriminatory intent to remove from the venire members of a cognizable group. *Powers v. Ohio*, 499 U.S. 400, 415 (1991). If both elements of the first step are not established, the trial court should deny the motion and the inquiry ends. *Batson*, 476 U.S. at 96-97.

If both elements of the first step are established, then in the second step, the burden of production shifts to the opposing party to present a nondiscriminatory, race-neutral reason for

---

[1]     For sake of clarity, this Court will refer to the proponent's prima facie burden in the first step as "discriminatory intent." In the third step, and with regard to the district court's ultimate conclusion, we will refer to the standard as "purposeful discrimination." We note that courts use these terms interchangeable and synonymously. We are not changing the definition of either term, but only differentiate the terms for clarity in discussing each step of a *Batson* analysis.

4

striking the prospective juror.  *See id.* at 97.  The focus of this second step is on the facial validity of the opposing party's explanation; it "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *State v. Ish*, 166 Idaho 492, 502, 461 P.3d 774, 784 (2020).  Thus, unless a discriminatory intent is inherent in the explanation, the reason offered will be considered race neutral.  *Purkett*, 514 U.S. at 768; *Ish*, 166 Idaho at 502, 461 P.3d at 784.  Once a race-neutral reason is offered, the *Batson* analysis proceeds to the third step.  In the third step, the trial court must determine whether purposeful discrimination has been established, i.e., whether the prospective juror was removed based on race.  *See Hernandez v. New York*, 500 U.S. 352, 363 (1991) (plurality opinion); *Batson*, 476 U.S. at 98.  In the third step, the moving party bears the burden of persuasion.  *Purkett*, 514 U.S. at 768.

The third step requires the trial court to consider the totality of the circumstances, including the weight of the proffered race-neutral explanation(s) in light of all the relevant facts, circumstances, and arguments presented to determine whether the peremptory strike was substantially motivated by purposeful discrimination.  *Flowers*, ___ U.S. at ___, 139 S. Ct. at 2243-44; *Ish*, 166 Idaho at 503, 461 P.3d at 785.  Ultimately, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."  *Hernandez*, 500 U.S. at 365.  As such, the trial court's determination of purposeful discrimination largely turns on its evaluation of credibility.  *Id.* at 364.  Throughout this three-step process, the ultimate burden of persuasion regarding racial motivation remains with the party asserting a violation.  *Purkett*, 514 U.S. at 768.  Although the determination of whether the constitutional requirements have been met is reviewed de novo, a trial court's finding of purposeful discrimination under the third prong of *Batson* is a pure issue of fact and, as such, will not be overturned unless it is clearly erroneous.  *Hernandez*, 500 U.S. at 364; *Ish*, 166 Idaho at 501, 461 P.3d at 783.

In this case, after peremptory challenges were exercised, Emerson asked for a sidebar, which was held off the record.  In that sidebar, Emerson raised a *Batson* challenge.  After the jury was seated, instructed, and then excused, the district court addressed the *Batson* challenge.  The district court stated that it wanted to make a record of the *Batson* discussion that occurred during the sidebar.  The district court summarized the arguments as follows:

> Juror 17 appeared to be African-American, as the defendant appears to be as well, and that's the, I guess, the basis for the challenge, that the State had used a peremptory challenge against the only apparently African-American juror in the

jury pool, so that seemed to me that it may have made out a prima facie case, I suppose of the challenge being exercised based on race considerations so I asked the prosecutor to articulate a race-neutral explanation for the exercise of a peremptory challenge against Juror 17.

The prosecutor indicated along these lines: that, during the prosecutor's voir dire, the prosecutor had asked jurors about any things going on in their lives that would be sources of distraction, that might prevent them from giving their full attention to this case and handling their duties as jurors attentively, and Juror 17 was one of the jurors who expressed concerns along those lines. Juror 17 indicated that he had a lot of stuff going on in his life with school and work and a pregnant girlfriend, and the flavor, to me, of Juror 17's remarks was that he very much did not wish to be here.

The prosecutor also indicated that the prosecutor watched Juror 17 during portions of voir dire and saw body language or positioning suggestive of not paying attention, not being engaged. I'm not in a position to express either agreement or disagreement on that. I didn't perceive it myself, but regardless, I do agree that the prosecutor gave a race-neutral explanation for the exercise of the peremptory challenge that I conclude was a genuine explanation and is not a pretext or a cover for a decision to excuse the only black juror on grounds of race, and as I said, I didn't observe one way or the other whether that juror appeared disengaged at times during voir dire, but I do share the perspective that the juror strongly, strongly indicated a desire to not be here, not to be selected, not to serve on this jury, and that, it seems to me, is a genuine race-neutral reason for the exercise of the challenge.

After providing the above summary, the court asked the parties if that correctly summarized the discussion and if they had any additional argument. Emerson provided additional comments noting that it was clear to the defense and to the venire that Emerson was Black but provided no argument or evidence regarding discriminatory intent. The prosecutor then noted that he had attempted to strike the juror for cause and did so because Juror 17 said he could not be fair. The prosecutor offered that explanation as additional support for his decision to peremptorily strike Juror 17. The district court noted that additional reason. The district court then denied the *Batson* challenge.

### 1.     Prima facie case

The first step of a *Batson* analysis requires Emerson to make a prima facie showing that Juror 17 is a member of a cognizable racial group *and* that the prosecutor exercised its peremptory challenge to remove the juror because of the juror's race. *Batson*, 476 U.S. at 96-97. Emerson makes two arguments regarding the first step of *Batson*. First, he argues the district court correctly found he made a prima facie showing that the State exercised its peremptory challenge to Juror 17 with discriminatory intent. Second, Emerson argues that even if the district court did not make an

6

explicit finding regarding the first prong of the *Batson* challenge, he need not establish a prima facie showing because when the prosecutor defended its peremptory strike, the district court moved to the third step of the *Batson* analysis and addressed the ultimate question, thereby rendering moot the question of whether Emerson established a prima facie showing of intentional discrimination. The State argues that Emerson's reliance solely upon the prosecutor's strike of the only Black prospective juror on the venire does not establish a prima facie case of discriminatory intent but stated at oral argument that Emerson's arguments regarding purposeful discrimination were preserved for appeal.

In this case, Emerson did not establish a prima facie case of discriminatory intent under the first prong of the *Batson* analysis. The district court found that Emerson and Juror 17 are Black.[2] Accepting the district court's finding, Emerson has shown by prima facie evidence that Juror 17 is a member of a cognizable racial group. As to the second part of the first step, the district court found that the State struck the "only apparently African-American juror in the jury pool," and so it "seemed to me that it may have made out a prima facie case, I suppose, of the challenge being exercised based on race considerations." The district court's analysis appears to rest upon the premise that the use of a peremptory challenge to strike the only identified Black prospective juror establishes a prima facie showing of discriminatory intent; however, more is required to establish *Batson*'s first step.

A defendant seeking to establish a prima facie case of discriminatory intent "must point to facts and circumstances raising an inference that the potential juror[] w[as] excluded *because of* race." *United States v. Cooper*, 19 F.3d 1154, 1159 (7th Cir. 1994) (emphasis added). Put another way, the proponent of a *Batson* challenge satisfies the requirements of *Batson*'s first step only by

---

[2]    In this case, the district court made a factual finding regarding the race of Juror 17. This factual finding is essential to a *Batson* analysis. For several reasons, appellate courts should not assume a person's race, ethnicity, or gender based only upon a description of that person's physical characteristics by a third party. First, to do so reinforces pernicious stereotypes based on physical appearance. Second, a third party should not be assigning a race or ethnicity to a prospective juror because there is no way to know whether the party's assignment is correct without any evidence. Third, a person's physical appearance may not accurately reflect nuances of race or ethnicity because it does not necessarily account for mixed race or bi-racial people who may or may not identify with the race or ethnicity third parties believe them to be. Fourth, appellate courts do not use factual assumptions as the foundation for legal decisions. All of these reasons illustrate why evidence of the prospective juror(s)' race, ethnicity, or gender is essential and should not be assumed.

*producing evidence* sufficient to permit the trial judge to draw an inference that discrimination has occurred. *Johnson v. California*, 545 U.S. 162, 170 (2005). If the proponent of the motion fails to establish a prima facie case, then the burden of production does not shift to the prosecutor to provide a race-neutral explanation for the strike and the motion is properly denied. *Cooperwood v. Cambra*, 245 F.3d 1042, 1045 (9th Cir. 2001).

"A '*prima facie* case' means the 'production of enough evidence to allow the fact-finder to infer the fact at issue and rule in the party's favor.'" *Pizzuto v. State*, 146 Idaho 720, 728, 202 P.3d 642, 650 (2008) (quoting *Black's Law Dictionary* 1209 (Bryan A. Garner ed., 7th ed., West 1999)). Thus, even if a party provides evidence that the struck juror is a person to whom protected class status applies, the party must still present prima facie evidence of discriminatory intent. *Batson*, 476 U.S. at 96-97.

Evidence of discriminatory intent may include evidence of statistical patterns of removing members of a protected class; historical practices of discrimination, side-by-side comparisons, or disparate questioning of similarly situated venire members; or any other circumstance or behavior the defendant wishes to challenge. But, each allegation must be supported by evidence. *Flowers*, ___ U.S. at ___, 139 S. Ct. at 2243 (noting that defendants are not limited in the type of evidence they can present to support claim of racial bias); *see also Cooper*, 19 F.3d at 1159 (holding that "to establish a *prima facie* case for purposeful discrimination under *Batson*, Cooper must do more than merely point to the fact that the government excluded two black venirepersons by using peremptory challenges. Cooper must point to facts and circumstances raising an inference that the potential jurors were excluded because of race. Otherwise, every peremptory challenge used to exclude any cognizable minority from a petit jury would require a *Batson*-type hearing").

In order for the trial court to determine whether the proponent has met its initial evidentiary burden of proof and, thus, shift the burden of production to the State, the proponent must provide evidence on which the allegation is based and provide argument as to how that evidence demonstrates discriminatory intent. If no evidence is produced or argument made, the motion's proponent has not made a prima facie showing of discriminatory intent and the trial court should deny the motion. Similarly, in order for the State to respond to the allegations of discriminatory intent, it must also be aware of the evidence upon which the proponent relies in making the allegation. Requiring the proponent to meet this evidentiary standard "is not to be taken for granted or ignored" because "[u]nder the *Batson* framework, a defendant has a meaningful burden to

8

establish a *prima facie* case of discrimination before a court may require explanation from the government." *United States v. Stephens*, 421 F.3d 503, 519 (7th Cir. 2005) (Judge Kanne concurrence in part) (citing *United States v. Stewart*, 65 F.3d 918, 925 (11th Cir. 1995)); *United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir. 1994).

While a statement that a member of a protected class was struck from a jury venire may demonstrate that the exercise of the peremptory strike resulted in a racially disproportionate impact, evidence of disproportionate impact does not supplant evidence of discriminatory intent. This is because regardless of (and in addition to) showing a disparate impact, the proponent of a *Batson* challenge must still provide proof of racially discriminatory intent or purpose. *Hernandez*, 500 U.S. at 359-62. Racially discriminatory intent or purpose "implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id*. at 360 (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted)). "Phrased another way, the mere fact that the prosecutor challenges the only juror of a particular race, without more, does not automatically give rise to an inescapable inference of discriminatory intent. A defendant who advances a *Batson* argument ordinarily should 'come forward with facts, not just numbers alone.'" *Bergodere*, 40 F.3d at 516 (quoting *United States v. Moore*, 895 F.2d 484, 485 (8th Cir. 1990)).

*Batson* and its progeny do not hold that a party making a *Batson* challenge establishes a prima facie case of discriminatory intent by simply claiming a member of a protected class was struck from the jury venire. Instead, the precedent holds the opposite: the proponent of a *Batson* challenge fails to meet his prima facie burden of establishing discriminatory intent by simply stating that the State struck the only Black person in the venire or any version thereof, such as recasting the strike of one Black juror as excluding 100% of Black prospective jurors. *United States v. Cooke*, 110 F.3d 1288, 1301 (7th Cir.1997) ("[The defendant] must do more than merely point to the fact that the government excluded an African-American venireperson."); *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 941 (7th Cir. 2001) ("[T]he exclusion of all members of a specific minority group does not, on its own, establish that the peremptory strikes were discriminatory."); *Boyd v. Newland*, 467 F.3d 1139, 1143, 1147 (9th Cir. 2006) (noting that simply alleging peremptory strike was used to strike second Black juror from pool, leaving only two other Black jurors, and nothing in voir dire intimated legitimate basis for removal, alone, was insufficient

9

to establish prima facie case, but suggested Petitioner's *Batson* claim was at least plausible, and court should consider context in order to determine whether petitioner raised an inference of discrimination).

Thus, striking the only person of color does not establish prima facie evidence of discriminatory intent because a district court could not infer discriminatory intent from a single strike and rule in the proponent's favor, which is the definition of prima facie evidence. "The Supreme Court has never held that 100% exclusion rate is conclusive proof of discriminatory intent and has always used qualified language regarding statistical analysis." *Ish*, 166 Idaho at 504, 461 P.3d at 786; *see also United States v. Roberts*, 163 F.3d 998, 999 (7th Cir. 1998) ("*Batson* establishes a rule of disparate treatment, not of disparate impact.").

For example, in *Coulter v. Gilmore*, 155 F.3d 912 (7th Cir. 1988), a *Batson* challenge was raised where only sixteen of the fifty-five persons in the venire were Black and the State used nine of its peremptory challenges to strike nine of the Black prospective jurors, struck one non-Black prospective juror, and left four peremptory challenges unexercised. *Coulter*, 155 F.3d at 915, 919. The final jury consisted of eight Caucasian people, one Hispanic person, and three Black people. *Id*. at 915. The two alternates were also Black. *Id.* Thus, the State used all but one of its peremptory strikes against Black prospective jurors where only sixteen of the fifty-five-person venire were Black. *Id*. at 919. While courts have cautioned against "*necessarily* finding a racially discriminatory pattern of strikes by comparing the percentage of peremptories used against minority jurors with the racial composition of the entire venire," the Court in *Coulter* noted such a comparison in Coulter's case was plainly relevant "since there are confluent race related patterns in both the absolute number of strikes used, and the percentage of strikes used against African-Americans as compared to their representation in the overall venire." *Id.* at 919; *see also United States v. Armstrong*, 517 U.S. 456, 468 (1996) (noting "the significance [of a peremptory challenge against a minority venireperson] may differ if the venire consists mostly of blacks or of whites").

Similarly, in *United States v. Alvarado*, 923 F.2d 253 (2d Cir. 1991), the Court noted:

> *Batson*'s citation of *Castaneda v. Partida*, 430 U.S. 482 (1977), in connection with the assessment of a *prima facie* case, *Batson*, 476 U.S. at 96, indicates that statistical disparities are to be examined. Here, the prosecution's challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates. Whether this rate creates a statistical disparity would require knowing the minority percentage of the venire; for example, if the minority percentage of

10

the venire was 50, it could be expected that a prosecutor, acting without discriminatory intent, would use 50 percent of his challenges against minorities. Only a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination.

*Alvarado*, 923 F.2d at 255-56.

Emerson provided no evidence regarding the initial jurors selected, of which Juror 17 was one, as compared to the entire venire or to the demographics of Ada County. Whether striking Juror 17 creates a statistical disparity would require information about the minority representation on the venire, specifically, or Ada County, generally. Only a strike rate significantly higher than the minority percentage of the venire would support a statistical inference of discrimination.

The district court stated that "the State had used a peremptory challenge against the only apparently African-American juror in the jury pool." However, this statement does not make clear whether Juror 17 was the only Black person selected from the venire to serve in the initial jury pool or was the only Black person in the venire. Moreover, no evidence was presented about the statistical representation of Black people in Ada County from which the venire would be summoned.[3] *See also Roberts*, 163 F.3d at 999; *Cooke*, 110 F.3d at 1301. The demographic information illustrates why this evidence is so important because it would provide evidence that the peremptory strike of Juror 17 was exercised with discriminatory intent as opposed to just being a circumstance of demographics. Regardless, Emerson has failed to demonstrate a statistical disparity.

In *Miller-El v. Cockrell*, 537 U.S. 322 (2003), the Court noted that "happenstance is unlikely to produce [the] disparity" of the prosecutor using ten of his fourteen peremptory strikes against African Americans. *Cockrell*, 537 U.S. at 342. But in this case, we do not have a pattern of multiple peremptory strikes being used to remove all Black prospective jurors. Instead, we have a circumstance more akin to the circumstance in *Bergodere*. There, the State used a peremptory strike against a single juror, and Bergodere raised a *Batson* challenge. *Bergodere*, 40 F.3d at 515. The First Circuit Court of Appeals affirmed the district court's finding that Bergodere failed to establish a prima facie showing of intentional discrimination, noting:

---

[3]    According to the United States 2020 census report, of which this Court can take judicial notice, *see* Idaho Rule of Evidence 201, Ada County's population estimates as of April 1, 2020, provides the following Race and Hispanic Origin information: White alone, percent: 91.5%; Black or African American alone, percent: 1.4%; Two or more races, percent: 3.1%. *See* https://www.census.gov/quickfacts/fact/table/adacountyidaho.

Here, the defendant provided nothing in the way of either direct or circumstantial proof to buttress the naked statistic on which he relies. This failure is all the more glaring because the circumstances attendant to the Goodrum strike point away from an inference of discrimination. This case involves a single strike, not multiple strikes. The government's other peremptories were exercised in an unexceptionable manner. Appellant essayed no proffer showing that either the particular prosecutor or the prosecutor's office regularly engaged in a pattern of suspicious strikes. The prosecutor's questions and statements during voir dire do not suggest racial discrimination, but, instead, seem to reflect a concern with the prospective juror's ability to reach a fair and impartial verdict.

*Id.* at 516. Emerson's case is remarkably similar. The State used one of its three peremptory strikes to remove a juror, who happens to be Black, from a jury pool reflecting the demographics from which it was drawn. One is not a stark statistical number, and no additional evidence was presented to explain why it would be. As explained both above and in greater detail below, the prosecutor's questions during voir dire and his explanation for the strike, do not suggest racial discrimination, but instead, reflect the concern noted by the district court: that Juror 17 did not want to be selected for the jury.

We recognize that the Idaho Supreme Court noted in *Ish* that "statistical evidence is not [dispositive] evidence of discriminatory intent but may be strong evidence on which to infer discriminatory intent and to establish a prima facie case." *Ish*, 166 Idaho at 509, 461 P.2d at 791. We agree with this general proposition where evidence is presented and that evidence is something more than the proponent of the motion stating that the opposing party struck the only member of a protected class. However, if the motion's proponent need only note that a minority juror was struck from the venire to establish a prima facie case of discriminatory intent, then in this case, because Juror 17 was the only Black prospective juror, it would have been impossible for the government to strike him even for a non-race-based reason without creating an inference of discrimination. To permit such an inference in the absence of any evidence of discriminatory intent is inconsistent with *Batson* and its progeny.

Notably, although in *Ish* the Idaho Supreme Court did not analyze the first prong of a *Batson* challenge, it nonetheless concluded that "the prosecution's use of six of its twelve peremptory challenges to strike all six remaining minority jurors is insufficient, on its own, to constitute clear error" in the district court's determination that the prosecution's use of its peremptory strikes did not demonstrate purposeful discrimination. *Ish*, 166 Idaho at 504, 461 P.2d at 786. We agree that, standing alone, the number of strikes fails to establish purposeful

12

discrimination in the third step of a *Batson* analysis, but in accord with federal precedent, it similarly fails to establish a prima facie case of discriminatory intent in the first step.

The Idaho Supreme Court also stated in *Ish* that "the use of peremptory challenges resulting in discriminatory impact raises an inference of discriminatory intent." *Ish*, 166 Idaho at 504, 461 P.3d at 786 (citing *Cockrell*, 537 U.S. at 342). However, as discussed above, this statement is at odds with federal precedent that holds that, standing alone, the "numbers," however characterized, are insufficient to establish a prima facie showing of discriminatory intent absent some additional evidence. *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); *Hernandez*, 500 U.S. at 362; *Alverio*, 253 F.3d at 941; *Ish*, 166 Idaho at 504, 461 P.3d at 786. This is because "[a]n argument relating to the impact of a classification does not alone show its purpose." *Hernandez*, 500 U.S. at 362.

It is true the United States Supreme Court has recognized that "in the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers*, ___ U.S. at ___, 139 S. Ct. at 2241. However, *Flowers* does not stand for the proposition that the peremptory challenge of a single minority juror establishes a prima facie showing of discriminatory intent or ultimately establishes purposeful discrimination, not least because *Flowers* is significantly factually dissimilar to this case in three ways. First, *Flowers* was "a highly unusual case," and "likely one of a kind," in light of its procedural history. *Id*. at ___, 139 S. Ct. at 2251 (Justice Alito concurring in opinion). Flowers stood trial six times for the murder of four people. *Id*. Three times, Flowers was convicted and sentenced to death; all three convictions were reversed by the Mississippi Supreme Court. *Id*. In the first five trials, the State was represented by the same prosecutor, despite "many of those trials [being] marred by racial discrimination in the selection of jurors and prosecutorial misconduct." *Id*. Second, in *Flowers*, there was a *Batson* hearing at which the defendant presented evidence upon which the trial court could base its decision. *Id*. at ___, 139 S. Ct. at 2259-60. Third, the statistical evidence upon which Flowers relied included a historical pattern of racial exclusion of jurors in the jurisdiction in question and over the course of Flowers' six prior trials.[4] *Id*. at ___, 139 S. Ct. at 2245. For example, Flowers presented evidence that over the course of his six trials, the State employed its peremptory

---

[4]     The Court was provided evidence of the State's exercise of peremptory strikes in Flowers' first four trials, there was no record from the fifth trial regarding the race of the jurors, and the Court used that evidence to support a conclusion that the exercise of peremptory challenges in Flowers sixth trial was "motivated in substantial part by discriminatory intent." *Flowers v. Mississippi*, ___ U.S. ___, ___, 139 S. Ct. 2228, 2245 (2019).

13

challenges to strike forty-one of the forty-two Black prospective jurors that it could have struck; a statistic the State acknowledged at oral argument. *Id*. at ___, 139 S. Ct. at 2235. The Court also noted that in two of the trials, the Mississippi State Courts found the State exercised its peremptory strikes with discriminatory intent. *Id*. The Court then addressed Flowers' sixth trial, which was the trial before the Court. The Court noted that in that trial, six of the twenty-six prospective jurors were Black. *Id*. at ___, 139 S. Ct. at 2246. The State struck five of the six prospective Black jurors. *Id*.

Flowers argued four bases on which discriminatory intent was established: the historical pattern of discriminatory intent across all of his prior trials; the peremptory strikes of five of the six Black prospective jurors in the sixth trial; the "dramatically disparate" questioning of Black and White prospective jurors in the sixth trial; and the strike of a Black prospective juror who was similarly situated to White prospective jurors who were not struck. *Id*. at ___, 139 S. Ct. at 2244. The United States Supreme Court explicitly held that it would not decide whether any of the four bases individually constituted clear error. *Id*. at ___, 139 S. Ct. at 2235. Instead, the Court held that "all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike" of one black prospective juror was not "motivated in substantial part by discriminatory intent." *Id*. (quoting *Foster* v. *Chatman*, 578 U.S. ___, ___, 136 S. Ct. 1737, 1754 (2016) (internal quotation marks omitted)). It also noted that in light of the history of Flowers' previous trials and the State's continued attempt to strike all minority jurors over the history of the case, striking five of the six Black prospective jurors was "further evidence suggesting that the State was motivated in substantial part by discriminatory intent." *Id*. at ___, 139 S. Ct. at 2246.

This case is not like *Flowers*; there is no evidence of a historical pattern of discrimination; there were not multiple trials marred by racial discrimination in jury selection; and there was no evidence or argument presented at the *Batson* hearing regarding discriminatory intent other than the fact that the State used one peremptory challenge to strike Juror 17, the only Black juror in the venire.

Also of note is that Emerson's trial took place during the COVID-19 pandemic and, thus, was subject to the Idaho Supreme Court's various emergency orders. Those emergency orders limited the number of peremptory strikes to three strikes per party. With each strike, the prosecutor was using 33.33 percent of his peremptory challenges. It sounds much more egregious to

14

characterize what happened as, "The prosecutor used 33.33 percent of his peremptory challenges to remove 100 percent of Black people from the venire," when the reality is that the prosecutor used one of his three peremptory strikes to remove one person from the venire who happened to be the only Black person.

When no evidence of discriminatory intent is presented at the *Batson* hearing, there is no context for a claim of statistical disparity which, in part, illustrates why a general numerical challenge fails to establish a prima facie case of discriminatory intent. Standing alone, the peremptory challenge of one juror is insufficient for a trial court to infer discriminatory intent in the first step of a *Batson* challenge or conclude in the third step that a peremptory challenge was exercised with purposeful discrimination. Consequently, Emerson's sole reliance on the State's exercise of one peremptory challenge to strike Juror 17 was not evidence of, or the basis for, a reasonable inference of discriminatory intent in the first step of the *Batson* analysis.

Emerson's second argument regarding the first step of a *Batson* analysis is that it is irrelevant whether he presented prima facie evidence of discriminatory intent because the State proffered a race-neutral reason and the district court ruled on the ultimate issue. The portion of *Hernandez* on which Emerson relies explains that:

> in the context of employment discrimination litigation under Title VII of the Civil Rights Act of 1964 that "*[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case*, whether the plaintiff really did so is no longer relevant." The same principle applies under *Batson.* Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.

*Hernandez* at 359 (emphasis added). However, this excerpt has two components. The first relates to how the burden of proof shifts between the parties. Once a trial court rules on the third prong of the *Batson* analysis, it has applied the more stringent burden of proof and ruled on the ultimate factual issue; therefore, whether the moving party met the preliminary, lower prima facie burden of proof is irrelevant. *Id.*; *see also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (holding prima facie requirement was "never intended to be rigid, mechanized, or ritualistic"; "it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination").

The second component, however, relates to the factual showing that must be made in order to shift the burden of proof. In *Hernandez*, the defense raised a *Batson* challenge to the State's peremptory strike of four Latino jurors. *Hernandez*, 500 U.S. at 355-56. The prosecutor stated he was not certain as to the racial identity of two of the jurors and did not strike them because of their race but because he felt the two would not accept the interpreter's interpretation. *Id.* at 356. On appeal, the New York Supreme Court, Appellate Division, noted that though the ethnicity of one challenged bilingual juror remained uncertain, the prosecutor had challenged the only three prospective jurors with definite Hispanic surnames. *Id.* at 358. The United States Supreme Court deferred to the factual findings of the lower New York courts and then affirmed the judgment, holding that the prosecutor had offered a legitimate basis for challenging the jurors in question. *Id.* Thus, the reason the United States Supreme Court concluded it could rule on the third step rested, in part, on the fact that factual findings were made in the New York trial courts. These factual findings provided the United States Supreme Court with the factual information necessary to resolve the *Batson* challenge. *Id.*

We agree *Hernandez* holds that if the proponent of a *Batson* challenge has done everything that would be required of him in terms of his evidentiary burden and has properly made out a prima facie case, then he has provided a sufficient factual basis for the trial court to shift the burden to the State to provide a race-neutral reason for the strike and ultimately, address the third step of a *Batson* challenge. Once a court rules on the third step of the *Batson* analysis, whether the moving party has established his initial prima facie case is irrelevant for purposes of shifting the burden of proof to the State. However, we decline to hold that a court's willingness to shift the burden of proof is appropriate in the absence of the proponent meeting his required evidentiary burden or that all the necessary factual predicates for the claim have been established. More problematic for Emerson is that even if this Court proceeds to the third step of the *Batson* challenge, Emerson is still limited to the evidence presented and arguments made in the trial court when asserting a prima facie showing of discriminatory intent. Emerson failed to provide any evidence of discriminatory intent or argument other than his general allegation. Requiring the motion's proponent to meet its evidentiary burden in the first step of a *Batson* challenge, point to evidence of discriminatory intent, and explain how the evidence establishes a reasonable inference of discriminatory intent creates a record and preserves the argument for appellate review. Because the remainder of Emerson's arguments on this issue relate to the third step of the *Batson* analysis, we do not address

16

them here. Accordingly, we turn to the second step of *Batson*: whether the State offered a race-neutral reason to support the peremptory strike.

### 2. State's race-neutral reason

Once the opponent of the *Batson* challenge offers a reason for the use of the peremptory strike, the trial "court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause." *Hernandez*, 500 U.S. at 359. At this step, the trial court looks only to the facial validity of the explanation. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id*. at 360. The disparate impact of the strike on the racial composition of the jury is not conclusive when determining whether the proffered reason for the strike is race neutral. *Id*. at 362.

In this case, the State explained that its reason for striking Juror 17 was that Juror 17 expressed an inability to give his full attention to the case and "Juror 17's remarks [were] that he very much did not wish to be here." The prosecutor also indicated that during portions of voir dire, Juror 17 exhibited "body language or positioning suggestive of not paying attention, not being engaged." The district court noted that it did not observe Juror 17's behavior and declined to consider that behavior as an independent basis for the strike. However, the district court considered Juror 17's remarks that he did not wish to be there and found the prosecutor's reason to strike Jury 17 to be race neutral. Emerson concedes that the prosecutor's explanation is facially race neutral. Moreover, there was substantial and competent evidence supporting the district court's conclusion that the State offered a race-neutral reason for the peremptory strike as required under the second step of *Batson*, and the district court's finding that the State offered a nondiscriminatory, race-neutral reason for peremptorily striking Juror 17 was not clearly erroneous.

### 3. Purposeful discrimination

We turn to the third step in the *Batson* analysis where the district court considers whether the State purposefully discriminated when it used a peremptory strike against Juror 17. The United States Supreme Court has made clear that the trial court's decision on the third step represents a finding of fact of the sort accorded great deference on appeal:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence

17

often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

*Hernandez*, 500 U.S. at 365.

At trial, Emerson's only argument regarding purposeful discrimination was based solely on the fact that the prosecutor struck the only Black juror. On appeal and for the first time, Emerson proffers several different and additional arguments: statistical evidence, side-by-side comparisons, disparate questioning of similarly situated jurors, and other circumstances. The determination of whether the constitutional requirements in a *Batson* challenge have been met is reviewed de novo. *Ish*, 166 Idaho at 501, 461 P.3d at 783.

Under *Batson*, the trial court must decide whether, *in light of the parties' submissions*, the defendant has shown purposeful discrimination. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). A review of a prosecutor's reason for the strike stands or falls on the plausibility of the reasons he gives. *Dretke*, 545 U.S. at, 252. "The same rule must apply to the defendant, the party with the ultimate burden of proving purposeful discrimination." *Flowers*, ___ U.S. at ___-___, 139 S. Ct. 2259-60 (Thomas, with whom Gorsuch joins as to Parts I, II, and III, dissenting). If the proponent offers no argument and evidence to support the proponent's assertion of discriminatory intent, he fails to establish a prima facie case of discriminatory intent in the first step of a *Batson* analysis. Moreover, on appeal, the movant waives any claim of error regarding the trial court's ultimate finding of no purposeful discrimination on any ground not argued to the trial court.

Numerous federal cases have recognized that failing to articulate a specific basis as evidence of discriminatory intent results in a waiver of the issue on appeal. *See United States v. Walley*, 567 F.3d 354, 358 (8th Cir. 2009) (declining to consider defendant's argument on appeal that government's explanation for strike was pretextual because defendant failed to raise it before trial court); *United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003) (reviewing for plain error because defendant failed to rebut government's explanation for strike); *United States v. Contreras-Contreras*, 83 F.3d 1103, 1105 (9th Cir. 1996) (reviewing for plain error because defendant failed to rebut government's explanation for strike); *see also Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1028 (4th Cir. 1998) (holding party waived *Batson* challenge by failing to dispute opposing party's proffered reason for peremptory strike); *United States v. Arce*, 997 F.2d 1123, 1127 (5th Cir. 1993) (same); *United States v. Rudas*, 905 F.2d 38, 39 (2d Cir. 1990) (same).

18

We recognize that, in *Snyder*, the United States Supreme Court conducted a comparative-juror analysis when addressing a *Batson* challenge despite the argument not being raised before the trial court. However, the Court noted that the state supreme court had not held that the comparative-juror analysis was "procedurally defaulted" but, instead, had conducted its own comparative-juror analysis on appeal. *Snyder*, 552 U.S at 483 n.2. Because the Court deferred to the state court's application of its procedural rules, the Court's ruling in *Snyder* did not create an exception to a state's preservation requirements.

Idaho's appellate courts consistently apply the state-based preservation requirements referenced in *Snyder*. *Garcia-Rodriguez*, 162 Idaho 271, 275, 396 P.3d 700, 704 (2017). In Idaho, appellate court review is limited to the evidence, theories, and arguments that were presented below. *Id.* This includes the basis for a *Batson* challenge. *Ish*, 166 Idaho at 509, 461 P.3d at 791. ("A trial court is not required to conduct a side-by-side comparative analysis if such comparison is not argued by the challenging party."). Consequently, in Idaho, a defendant must assert in the trial court the evidence and argument (including an argument based on a comparative juror analysis) disputing the State's proffered reasons for striking a juror in order to raise that argument on appeal. *Ish*, 166 Idaho at 505, 509; 461 P.3ed at 787, 791.

A comparison with *Garcia-Rodriguez* is particularly apt. In *Garcia-Rodriguez* the issue was whether the State preserved the argument justifying the warrantless search of Garcia-Rodriguez. *Garcia-Rodriguez*, 162 Idaho at 275, 396 P.3d at 704. Garcia-Rodriguez was arrested after a traffic stop for failing to purchase a driver's license. *Id.* at 274, 396 P.3d at 703. During the search incident to arrest, law enforcement found a controlled substance on Garcia-Rodriguez's person, and he was charged with possession of a controlled substance. *Id*. Garcia-Rodriguez filed a motion to suppress the evidence on the grounds that it was obtained in violation of his Fourth Amendment rights. *Id*.

When a defendant moves to exclude evidence pursuant to the Fourth Amendment, the government carries the burden of proving that the warrantless search or seizure in question was reasonable. *State v. Huntley*, 170 Idaho 521, 526, 513 P.3d 1141, 1146 (2022). In the trial court, the State argued Garcia-Rodriguez's warrantless arrest was justified pursuant to I.C. § 49-1407. *Garcia-Rodriguez*, 162 Idaho at 275, 396 P.3d at 704. The district court disagreed and granted Garcia-Rodriguez's motion, concluding that the initial stop, the continued detention, and ultimate arrest were all unlawful. *Id*. at 703, 396 P.3d 724. The State appealed. *Id.*

19

On appeal, and for the first time, the State argued that the district court erred in suppressing the evidence because whether the arrest was justified pursuant to I.C. § 49-1407(1) was immaterial since the arrest could be justified on separate, constitutional grounds. *Garcia-Rodriguez*, 162 Idaho at 274-75, 396 P.3d at 703-04. Garcia-Rodriguez argued the State did not argue in the trial court that there were separate, constitutional grounds justifying the arrest, and instead relied on I.C. as the basis for the arrest and thus, the argument was not preserved. The State responded that, "the [broader] issue of whether the 'stop and search' [was] constitutionally reasonable was raised by Garcia in his motion," and "[t]he prosecutor did not have a duty to negate every legal claim proposed in the motion to suppress, only establish the facts showing the officer's actions were reasonable." *Id.*

The Court rejected the State's argument, noting that nowhere in the trial court was the State's argument that I.C. § 49-1407 was immaterial as a basis justifying the arrest. *Garcia-Rodriguez*, 162 Idaho at 275, 396 P.3d at 704. The Idaho Supreme Court held that because the State argued in the district court that Garcia-Rodriguez's arrest was justified by I.C. § 49-1407(1) and did not argue there were separate, constitutional grounds justifying the arrest, the argument was not properly before the Court. *Id.* at 275, 396 P.3d at 704. Further, the Court held that the failure to raise the specific basis to justify the arrest in the trial court precluded the State from arguing that basis for the first time on appeal. *Id.* The Court declined "to adopt a 'wrong result-wrong theory' approach on behalf of the party with the burden of proof to reverse a lower court's decision based on issues neither raised nor argued below." *Id.* at 276, 396 P.3d at 705.

Similarly, in *State v. Hoskins*, 165 Idaho 217, 443 P.3d 231 (2019), the State argued it preserved the "general issue of 'exceptions to the Fourth Amendment's warrant requirement'" and, thus, was not limited to arguing the same exception to the warrant requirement on appeal as in the district court. *Hoskins*, 165 Idaho at 226, 443 P.3d at 240. The Supreme Court rejected that argument, holding that because the "State presented the trial court with the consent exception rather than the plain-view doctrine," it was precluded from raising the plain-view exception to the warrant requirement on appeal. *Id.*

In a suppression issue, the State carries the burden of proof justifying a warrantless search. In a *Batson* challenge, the proponent carries the burden of proof of purposeful discrimination. Just as the State cannot argue the "broader issue" that the warrantless arrest or search was justified on some unarticulated exception to the Fourth Amendment's warrant requirement, the proponent of a

*Batson* challenge cannot assert the "broader issue" of a general *Batson* claim in the trial court and preserve for appeal any and all specific arguments of discriminatory intent. Emerson made none of the specific arguments about discriminatory intent in the trial court that he now makes on appeal, with the exception of perhaps the statistical analysis. As a result, Emerson has failed to preserve for review any claim that a side-by-side comparison, disparate questioning of similarly situated jurors, or any other general circumstance reveals discriminatory intent on the part of the prosecutor.

As to Emerson's argument regarding a statistical analysis, although as discussed above he perhaps demonstrated disparate impact, disparate impact is insufficient to establish discriminatory intent or that the district court clearly erred in finding the State did not exercise its peremptory challenge with purposeful discrimination. Emerson did not provide any evidence or argument that the disparate impact equated to discriminatory intent in the district court. If the defendant makes no argument on a particular point, the trial court's failure to consider that argument cannot be erroneous, much less clearly so. *See, e.g., Flowers*, ___ U.S. at ___-___, 139 S. Ct. 2259-60 (Thomas, with whom Gorsuch joins as to Parts I, II, and III, dissenting); *Wright v. Harris County*, 536 F.3d 436, 438 (5th Cir. 2008); *Davis*, 160 F.3d at 1027-28.

Thus, even if this Court reviews the district court's ultimate conclusion under the third step of the *Batson* analysis, Emerson is nonetheless limited to the evidence presented in the district court and the arguments he made there regarding discriminatory intent. In this case, as to every claim except perhaps the statistical analysis, Emerson failed to provide argument, resulting in a waiver of the argument on appeal. His failure to present evidence in the trial court results in an inability to establish clear error on appeal. But even if it were reviewed on the merits, Emerson's claim fails.

The district court found the State's explanation was credible and supported by its actions during voir dire, finding the State offered:

> a genuine explanation and is not a pretext or a cover for a decision to excuse the only black juror on grounds of race, and as I said, I didn't observe one way or the other whether that juror appeared disengaged at times during voir dire, but I do share the perspective that the juror strongly, strongly indicated a desire to not be here, not to be selected, not to serve on this jury, and that, it seems to me, is a genuine race-neutral reason for the exercise of the challenge.

A brief explanation of the voir dire process at Emerson's trial is necessary for context. When voir dire began, the district court indicated the jury panel would be a twelve-person jury, with two alternate jurors. Thus, the initial twenty people of the thirty-four-person pool were called.

Prospective Jurors 2 and 3 did not appear; thus, the first jury panel consisted of Juror 1 and Jurors 4-22. The district court then began general questioning and following its questions, excused Jurors 1, 5, 16, and 20 for cause. Thus, the second iteration of the jury panel consisted of Jurors 4, 6-15, 17-19, and 21-26. Emerson and the State were each given one and one-half hours for voir dire. Each party had three peremptory challenges. After the State and the defense questioned the venire, the district court excused Jurors 10, 12, 14, and 23 for cause. Thus, the third iteration of the jury panel consisted of Jurors 4, 6-9, 11, 13, 15, 17-19, 21, 22, and 24-30. The State then exercised its peremptory challenges against Jurors 15, 17, and 21; the defense exercised its peremptory challenges against Jurors 8, 18, and 28.

In its voir dire, the State asked the panel generally if there were any jurors who felt "that you just do not want to be a juror." The prosecutor went on to ask if "anybody has that already kind of, already, 'I don't want to do this' kind of feeling?" Jurors 7, 10, 15, and 17 indicated they did not want to participate on the jury. Juror 26 indicated he/she would be happy to be selected for the jury except that work obligations would create an inconvenience if selected. The prosecutor followed up with each prospective juror and had the following exchange with Juror 17:

| | |
|---|---|
| Prosecutor: | And I saw an indication from the back. Juror--I just can't see your number. If you could flip that for me.<br>So Juror No. 17, go ahead. |
| No. 17: | Yeah. I just got, like, too much stuff going on outside, like, school, work. My girlfriend is, like, a couple of months pregnant, you know, so I don't think I'd be able to devote that type of, like, focus onto here. |
| Prosecutor: | Okay. And I hear what you're saying. So it sounds like just with life's pressures-- |
| No. 17: | Right. |
| Prosecutor: | --you think it would be difficult for you to focus? |
| No. 17: | Yes. |
| Prosecutor: | So let me clarify just a couple of points.<br>When we talk about focus, what we mean is you're going to come in and you're going to hear evidence day in and day out, and that evidence will be sometimes civilian witnesses, sometimes law enforcement, and then sometimes scientific or technical information. *And what you're expressing is that the--the life pressures you have going on are so significant that you can't sit and set aside time to actually think about the evidence being presented to you?* |
| No. 17: | *Yes*. |

22

(Emphasis added.) Based on that response, the State challenged Juror 17 for cause. Emerson moved to ask follow-up questions and the motion was granted. The questioning was as follows:

Defense:     Sir, thank you for sharing that.
Can you articulate or can you express what, in particular, would be the specific hardship that you would experience if you were to be called as a juror in this case?

No. 17:     The attention to my girlfriend that's pregnant, and then also school, because I've got a lot of that going on.

Defense:     Okay. So--

No. 17:     My focus with those two categories would be taken away from here.

Defense:     Okay. But it sounds like that's just a general, as you said previously, a general life issue. There's no, like, specific thing at school or with your--is there an appointment that you have scheduled that you'll miss? Nothing like that?

No. 17:     No, it's just--I mean, just general, basic life stuff that I think would take away from my focus here.

Defense:     *Okay. And you would agree that pretty much everybody in this panel has those types of pressures and those types of concerns, and do you think you could put that aside and be able to, if you were called, listen to the jury instructions and follow the instructions of the Court?*

No. 17:     *I don't really want to, to be honest.* I mean, I just--got--I got called up here, you know, just because I got called, like, with my number and stuff, so I showed up, but--

Defense:     So is it just generally you're unwilling to serve?

No. 17:     It's just--it's just life in general. I've just got too much stuff going on in life to really put my focus here, but, I mean, if I absolutely have to be here, then yeah, I'll be here.

Defense:     And you're willing to listen to the Court's instructions in that regard if the Court tells you that you are a juror in this case?

No. 17:     Yeah. Sure.

(Emphasis added.) The defense then argued there was an insufficient basis to dismiss Juror 17 for cause, and the district court denied the State's motion to disqualify Juror 17 for cause.

The State referenced this exchange with Juror 17 as one of two bases for the peremptory strike. The district court found this reason genuine and specifically noted, "and the flavor, to me, of Juror 17's remarks [were] that he very much did not wish to be here." In crediting the State's reason for striking Juror 17, the district court again noted, "I do share the perspective that the juror strongly, strongly, indicated a desire to not be here, not to be selected, not to serve on this jury." In light of the State's proffered reasons and the district court's nearly identical understanding about Juror 17's unwillingness to sit on the jury, the district court found the State's reason for exercising its peremptory strike "a genuine race-neutral reason."

23

Emerson argues the district court erred in finding the State did not purposefully discriminate against Juror 17 when striking him because the State's proffered reason for striking Juror 17 was pretextual in light of its lack of questioning of Juror 17 before striking him and because the "statistical evidence, evidence of disparate questioning, side-by-side comparisons, and the prosecutor's misrepresentation of the record" demonstrate purposeful discrimination. The State argues the factors show no such discrimination and the district court did not err.

### a. Statistical evidence in the record does not demonstrate purposeful discrimination

Emerson argues statistical evidence in the record provides "a strong inference of discrimination" so as to make the district court's finding under the third step of *Batson* clearly erroneous. Because Juror 17 was the only Black prospective juror, Emerson argues that the prosecutor "removed 100 percent" of Black jurors and such a stark statistic warrants an inference of discriminatory intent that demonstrates purposeful discrimination. It is true that, in some cases, appellate courts have found statistical evidence to be persuasive for establishing purposeful discrimination. *See Cockrell*, 537 U.S. at 332 (noting it was relevant that State struck 91% of potential Black jurors during voir dire process). However, Emerson acknowledges that no such pattern exists in this case. Instead, at issue is the single peremptory challenge. However, striking the only person of color does not conclusively establish purposeful discrimination because "[t]he Supreme Court has never held that 100% exclusion rate is conclusive proof of discriminatory intent and has always used qualified language regarding statistical analysis." *Ish*, 166 Idaho at 504, 461 P.3d at 786. As noted by Justice O'Connor in her concurrence in *Hernandez*:

> An unwavering line of cases from this Court holds that a violation of the Equal Protection Clause requires state action motivated by discriminatory intent; the disproportionate effects of state action are not sufficient to establish such a violation. In *Washington v. Davis*, 426 U.S. 229, 239 (1976), we explained that "our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact."

*Hernandez*, 500 U.S. at 372-73 (Justice O'Connor, with whom Justice Scalia joins, concurring in judgment). Accordingly, we do not find the State's exercise of one of three peremptory strikes to remove the one Black juror to be a stark statistic or to establish the State's proffered reason for the peremptory strike was pretextual.

### b.  Disparate questioning does not show purposeful discrimination

Emerson argues there was disparate questioning because of the five prospective jurors who indicated they did not want to be selected for service--Jurors 7, 10, 15, 17, and 26--the prosecutor questioned Juror 17 differently from the other jurors.  First, the district court dismissed Juror 10 on the State's motion to excuse for cause; leaving the questioning of 7, 15, and 26.  Emerson argues:

> With Juror 26, Juror 15, and Juror 17[5] the prosecutor asked far more questions as to the specifics of the jurors' situation and did not move to excuse any of them for cause.  With Juror 17, the prosecutor did not inquire at all on the juror's situation, immediately focused on the juror's inability to be fair, and moved to excuse the juror for cause.

Disparate questioning of similarly situated potential jurors may provide evidence that the State's reason for the exercise of its peremptory challenge was pretextual.  *See Cockrell*, 537 U.S. at 322.  In this case, we do not find the State engaged in disparate questioning or, to the extent the questions directed to prospective jurors were different, that it was evidence of pretext or purposeful discrimination.

Juror 15 was the director of all statewide OB/GYN clinics for a local hospital.  The prosecutor asked Juror 15, "Are there folks who can step in and cover for you while you're out? . . . and there is a time between now and when trial starts in earnest next Tuesday for you to make those arrangements?"  Juror 15 indicated that she could make those arrangements but would still be distracted.  The prosecutor then asked, "Do you think that would help then assuage some of your concerns for being distracted once you have all that stuff set up?"  Juror 15 responded, "Yeah, being able to get all that done in advance would eliminate distractions.  Just things happen every single day I'd be wondering about."

Juror 7 indicated that he worked on a farm and was responsible for irrigating 150 acres.  He testified that if he were called to jury duty, because of a shortage of workers, he would have to complete his farming duties prior to and immediately upon leaving jury duty, resulting in working two and one-half hours before and after sitting on the jury each day.  The prosecutor asked Juror 7:

> Prosecutor:  And so when it comes down to it, the--the question is:  Can you sit and listen to evidence, listen to instructions by the Court, and give both sides a fair shake?  In other words, listen, do your best to understand the evidence and then to make decisions based on that information presented to you.

---

[5]  We assume Emerson meant to reference Juror 7, rather than Juror 17.

25

No. 7:          I mean, it is possible, but, I mean, I'm going to be that much--you know, if I'm already waking up earlier, going to bed later, and getting short sleep, I--

Prosecutor:      But it sounds like you'll make every effort to be fair.

No. 7:          I would--I would make effort to be fair, yes, but . . . .

Juror 26 agreed that sitting on the jury was not a hardship, but was "just more of an inconvenience." In following up with Juror 26, the prosecutor stated:

Prosecutor:      And this question I'll later pose to--to all of you, but is there something about that, that specific thing going on in your life with work, and it could be something else in your life, too, that just sticks out in your mind as something that's very distracting, that would be so distracting that you couldn't devote the time and attention that this case requires to be fair, again, both to the State and to the defendant, in hearing evidence?

Juror 26:       I don't think so.

Emerson argues that unlike the questioning of Juror 7, the State challenged Juror 17 after a single question about Juror 17's situation. That is not entirely accurate. First, the State asked Juror 17 three questions about his ability to focus before challenging Juror 17 for cause. Second, the following exchange demonstrates that Juror 17 did not want to follow the district court's instructions and would not be fair to both sides:

Prosecutor:      Okay. And you would agree that pretty much everybody in this panel has those types of pressures and those types of concerns, and do you think you could put that aside and be able to, if you were called, listen to the jury instructions and follow the instructions of the Court?

No. 17:        *I don't really want to, to be honest.* I mean, I just--got--I got called up here, you know, just because I got called, like, with my number and stuff, so I showed up, but--

Prosecutor:      So are you telling us right now that that would affect your ability to be fair either to the State or the defense in evaluating fairly the evidence?

Juror 17:       Yes.

(Emphasis added.) In light of the response given by Juror 17, there was no reason for the State to follow up. Juror 17 indicated he did not want to be selected for the jury, he could not focus on the evidence, he did not want to follow the court's instructions, and he could not be fair to either party. Third, the language the State used in questioning Juror 17 is virtually identical to the language used to question Juror 26.

We decline to focus so narrowly on the language and whether it was couched as a positive (can you be fair?) or a negative (you cannot be fair?) because these minor discrepancies are not

26

necessarily indicative of purposeful discrimination. Rather, the questions are directly related to the response given by each of the prospective jurors. Moreover, the State used the same language to question Jurors 26 and 17 and, thus, did not question Juror 17 differently from other prospective jurors. Although Emerson emphasizes the State's lack of questioning about "where Juror [17] worked or went to school," such questions were superfluous in light of how Juror 17 "strongly, strongly indicated" that he did not want to be seated on the jury. Finally, Jurors 7, 15, and 26 all ultimately said they could be fair to both sides and listen to the evidence; Juror 17 indicated he did not want to do either. We decline to characterize the prosecutor's questions during voir dire as so dissimilar that they are strong evidence that the proffered reason for the strike was a pretext for racial discrimination. Accordingly, Emerson has not established disparate questioning shows the prosecutor's proffered reason for the strike was pretextual.

### c.    Side-by-side comparison

At oral argument, Emerson argued that when Juror 17's answers regarding hardship are compared with Juror 7's answers regarding hardship, the comparison reveals that Juror 7 articulated a much greater hardship than Juror 17 and, thus, the State's explanation for the strike was pretextual. We disagree. First, Emerson's argument regarding hardship rests entirely upon appellate counsel's assessment that, in their opinion, Juror 7 was experiencing much greater hardship than Juror 17 because of the time each day that Juror 7 would spend before and after trial irrigating at the ranch where he worked. The record provides no factual support that the expressed hardship Juror 7 might experience was greater than the expressed hardship Juror 17 was experiencing, and we decline to engage in speculation.

Moreover, the record reflects that Jurors 7 and 17 were not as similarly situated as Emerson argues. For example, Juror 7 said he would make every effort to be fair, while Juror 17 said he would not follow the instructions of the district court and never indicated he would be fair. Additionally, and as discussed below, we are not required to disregard the prosecutor's statements regarding Juror 17's demeanor when assessing credibility. Juror 17's ultimate response, "Yeah. Sure," may have been sarcastic and accompanied by demeanor that further reinforced his earlier statement that he did not want to be selected for the jury or it might have been an enthusiastic change of heart. Similarly, Juror 7's ultimate response, "I would--I would make effort to be fair, yes, but . . ." may have indicated a tone or attitude not reflected in the record and illustrates that:

a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.

*Snyder*, 552 U.S. at 483.

Emerson is asking this Court to reweigh the trial court's credibility assessment of the parties and make factual findings regarding the prospective jurors and their respective hardships. We decline to do so. As a result, Emerson has not established that a side-by-side comparison between Jurors 7 and 17 shows the prosecutor's proffered reason for the strike was pretextual.

### d. Other relevant factors do not show purposeful discrimination and do not make the district court's finding that there was no purposeful discrimination clearly erroneous

Finally, Emerson argues two other factors are relevant to assessing the prosecutor's race-neutral reason for striking Juror 17. First, Emerson references the State's description of Juror 17's lack of attention. Second, Emerson argues the exercise of the State's other two peremptory challenges removed prospective jurors who believed systemic racism existed and, thus, are evidence of the discriminatory purpose behind the peremptory strike of Juror 17.

As to the first factor, the State explained the bases for its exercise of its peremptory challenge: Juror 17 indicated he did not want to be selected for the jury and exhibited "body language or positioning suggestive of not paying attention, not being engaged." The district court noted that it did not observe the same behavior. On appeal, both Emerson and the State agree that because the district court did not make factual findings about whether Juror 17 was disengaged during voir dire, this Court cannot consider the prosecutor's representations about Juror 17's behavior in its *Batson* analysis. Both parties are incorrect.

It is true that when the district court does not make an explicit finding regarding a potential juror's demeanor, that reason cannot be credited as an independent basis to support the district court's finding that the State's proffered race-neutral reason for the strike was genuine. *Ish*, 166 Idaho at 508, 461 P.3d at 790. Thus, this Court will not credit the prosecutor's statements about Juror 17 "not paying attention" or "not being engaged" as an independent basis for the district court's conclusion that the State did not exercise its peremptory challenge with discriminatory intent. However, just because Juror 17's behavior is not an independent basis for the district

court's ultimate holding, this does not mean that the prosecutor's statements regarding Juror 17's behavior cannot be considered when assessing the credibility of the prosecutor's statements.

This issue was explicitly addressed in *Thaler v. Haynes*, 559 U.S. 43 (2010), and the United States Supreme Court held that where the basis of a peremptory strike was the juror's demeanor, the district court should take into account any observations the court made during voir dire. *Thayler*, 559 U.S. at 48. The Court went on to note, however, that "*Batson* plainly did not go further and hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor." *Thayler*, 559 U.S. at 48.

The Court further reasoned that *Synder* similarly did not require a wholesale disregard of the prosecutor's explanation of demeanor:

> The opinion in *Snyder* did note that when the explanation for a peremptory challenge "invoke[s] a juror's demeanor," the trial judge's "firsthand observations" are of great importance. And in explaining why we could not assume that the trial judge had credited the claim that the juror was nervous, we noted that, because the peremptory challenge was not exercised until sometime after the juror was questioned, the trial judge might not have recalled the juror's demeanor. These observations do not suggest that, in the absence of a personal recollection of the juror's demeanor, the judge could not have accepted the prosecutor's explanation. Indeed, *Snyder* quoted the observation in *Hernandez v. New York,* 500 U.S. 352, 365 (1991) (plurality opinion), that the best evidence of the intent of the attorney exercising a strike is often that attorney's demeanor.

*Thaler*, 559 U.S. at 49.

Here, although the district court did not notice Juror 17's demeanor, that does not mean the prosecutor did not observe such demeanor, the prosecutor improperly considered the demeanor when deciding to strike Juror 17, or that the district court erred in considering that statement when assessing the credibility of the prosecutor's reason for striking Juror 17. Instead, it only means Juror 17's demeanor cannot be the independent basis for the peremptory strike. In this case, and as discussed above, the prosecutor had other evidence, both exclusive of, and in addition to, Juror 17's demeanor, that provided a non-discriminatory basis for the exercise of the peremptory strike.

Finally, Emerson argues the State's peremptory strikes of Jurors 15 and 21 demonstrate evidence of purposeful discrimination because those jurors indicated systemic racism exists and is a problem. During voir dire, the defense questioned the jurors about whether any of the jurors lived in fear of violence or a fear that someone would be violent with them; whether any of the jurors had any prejudices or biases against Black people; whether any of the prospective jurors had ever used a racial epithet; whether anyone felt they could not render a fair and just verdict for

29

Emerson because he was Black; whether anyone belonged to any group that held White nationalist views; and whether any juror believed that racism was not an issue in the United States. Various jurors responded to the questions. For example, apparently one unidentified juror indicated bias or ill will towards Black individuals because after asking the question about ill will towards Black people, the prosecutor asked, "Show your placard, please. I appreciate that." Similarly, Juror 12 indicated he/she had used a racial epithet to describe Black people in the past. Jurors 12, 15, 18, 19, and 21 all indicated that racism existed and was a problem. Juror 18's response to one of the questions about racism was as follows:

| | |
|---|---|
| Prosecutor: | No. 18? Thank you. |
| No. 18: | I agree with what the last gentleman said. |
| Prosecutor: | 21? |
| No. 18: | That's exactly where we're at, and it's very complicated. It's a huge issue that is festering within communities, maybe not so much here, but within our nation. |
| | For example, his example of being pulled over. I was pulled over. I'm a Starbucks barrista. I was pulled over for speeding as I'm going to work in the morning, and the police officer said, you know, "I pulled you over for speeding. Where are you going so fast?" |
| | And I said, "oh, my gosh. I'm a Starbucks barrista. I'm heading to work." |
| | He goes, "Go ahead, head on out of here. Slow down a little bit, give yourself a few extra minutes on the way to work." |
| | And that was it, no ticket. And that's kind of a white privilege kind of thing, I feel like. So yes, it's an issue. |

The district court ultimately excused Juror 12 for cause; the State used peremptory challenges for Jurors 15 and 21; the defense struck Juror 18; and Juror 19 was selected as a final juror.

It is unclear why, after spending so much time addressing the issue, defense counsel would choose to strike Juror 18 who had a clear belief that racism existed, unless counsel had other reasons that gave rise to the their belief that striking Juror 18 was a reasonable trial strategy. The excerpt of Juror 18's response illustrates why "an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *Ish*, 166 Idaho at 505, 461 P.3d at 787 (quoting *Snyder*, 552 U.S. at 483). We cannot conclude that the State's peremptory strikes of Jurors 15 and 21 are evidence of purposeful discrimination, particularly when Juror 18, a juror who expressed similar beliefs, was struck by the defense and Juror 19, who also expressed similar beliefs, was not

30

challenged by either party. Accordingly, Emerson has not established that either of these factors is strong evidence that the State's proffered reason for the strike was pretextual.

Ultimately, we are left with two views of the limited record before us. Either the State was genuine in its explanation that it struck Juror 17 because Juror 17 explicitly stated that he did not want to sit on the jury, did not want to follow the district court's instructions, would not be fair, and his demeanor reflected that attitude; or, this explanation was pretextual and the State was motivated to remove Juror 17 because of his race. A district court can measure credibility by, among other factors, "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Cockrell*, 537 U.S. at 339; *Ish*, 166 Idaho at 503, 461 P.3d 775. When considering the third step of *Batson* challenges, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Cockrell*, 537 U.S. at 369.

The district court took a permissible view of the evidence in crediting the State's explanation, explicitly finding the prosecutor's explanation for his peremptory strike of Juror 17 was credible and not pretextual. The prosecutor offered a verifiable and legitimate explanation for the peremptory challenge of Juror 17; provided a race-neutral reason for the strike; and the district court corroborated the prosecutor's reason for the challenge that Juror 17 "strongly, strongly indicated a desire to not" be selected for the jury. Any and all of these factors can be considered as evidence of the prosecutor's sincerity and, thus, provide substantial and competent evidence supporting a conclusion that the State did not act with purposeful discrimination when it exercised its peremptory challenge against Juror 17. *See Flowers*, ___ U.S. at ___- ___139 S. Ct. at 2243-44 (in third step of *Batson*, trial court considers totality of circumstances, including weight of proffered race-neutral explanation in light of all relevant facts, circumstances, and arguments presented, to determine whether peremptory strike was substantially motivated by discriminatory intent).

In sum, the district court determined the State's use of a peremptory strike to remove Juror 17 was not racially motivated and none of Emerson's arguments or cited authority render the court's credibility determination clearly erroneous. Accordingly, the district court did not err in denying Emerson's *Batson* challenge after finding there was no purposeful discrimination in the State's use of a peremptory strike against Juror 17.

31

**B.      The District Court Did Not Err in Limiting Evidence of Alternate Perpetrator**

Emerson argues the district court denied him his constitutional right to a fair trial and abused its discretion when it limited his cross-examination of Det. Thorndyke about whether he followed up on investigative leads of D.E. and G.J.  Emerson asserts the district court erred when it limited the questioning on this topic because although Emerson explicitly disavowed that he was proffering the two as potential alternate perpetrators, the defense is nevertheless permitted to cross-examine an officer about whether the officer followed up on all investigative leads.  Emerson further argues the district court erred when it explained after the hearing that its decision was based on Idaho Rule of Evidence 403.  The State argues that the district court did not err in excluding the evidence because it was irrelevant and was unduly prejudicial pursuant to I.R.E. 403.  The State further argues that even if the court erred in preventing the questioning, such error was harmless.

The right to present a defense is protected by the Sixth Amendment to the United States Constitution and made applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "This right is a fundamental element of due process of law."  *Id.*  The right to present a defense includes the right to offer testimony of witnesses, compel their attendance, and to present the defendant's version of the facts "to the jury so it may decide where the truth lies."  *Id.*  However, this right must be balanced against any interest the state has in the criminal trial process; "the Sixth Amendment 'does not confer the right to present testimony free from the legitimate demands of the adversarial system.'"  *State v. Meister*, 148 Idaho 236, 239-40, 220 P.3d 1055, 1058-59 (2009); *State v. Albert*, 138 Idaho 284, 287, 62 P.3d 208, 211 (Ct. App. 2002) (quoting *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988)).

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  I.R.E. 401; *State v. Garcia*, 166 Idaho 661, 670, 462 P.3d 1125, 1134 (2020).  Whether a fact is of consequence or material is determined by its relationship to the legal theories presented by the parties.  *State v. Johnson*, 148 Idaho 664, 671, 227 P.3d 918, 925 (2010).  We review questions of relevance de novo.  *State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993); *State v. Aguilar*, 154 Idaho 201, 203, 296 P.3d 407, 409 (Ct. App. 2012).

Idaho Rule of Evidence 403 governs the exclusion of relevant evidence and permits a court to exclude evidence if its probative value is substantially outweighed by a danger of "unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." A trial court's ruling on cross-examination is subject to an abuse of discretion standard of review, *Clark v. Klein*, 137 Idaho 154, 156, 45 P.3d 810, 812 (2002), as is a district court's decision to admit or exclude evidence pursuant to I.R.E. 403. *State v. Enno*, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991); *State v. Clark*, 115 Idaho 1056, 1059, 772 P.2d 263, 266 (Ct. App. 1989). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the lower court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

The State filed a motion in limine to preclude Emerson from introducing any alternate perpetrator evidence because Emerson had not disclosed any evidence or witness that would support such testimony. Alternatively, the State argued Emerson should not be permitted to infer the possibility that an alternate perpetrator exists, absent evidence of an alternate perpetrator. At the hearing on the motion, the defense conceded they did not have a specific person that it could point to as an alternate perpetrator. However, the defense noted that it would be arguing:

> the investigators actually did not follow proper police procedures, did not investigate people whom they possessed specific information that was, frankly, disclosed to us by the State, so it's no surprise to them, that had specific information that they should have followed up on, but they didn't follow up on, that they did not exclude other people as potential suspects or perpetrators, and that's part of what we plan on presenting.

The district court asked defense counsel to clarify the argument because although the defense said they did not have evidence of, and thus would not point to, a specific alternate perpetrator, the defense also indicated it would question the investigators about failing to rule out other suspects. The defense acknowledged that the district court correctly understood defense counsel's argument saying:

> Correct, and that's not saying that we think that we have particular evidence that's going to prove somebody's guilt other than his, but we believe that there are--there is evidence that the operatives of the State, that the investigators in this case should have looked at other people. There were some specific instances of people who should have been looked at and weren't.

The defense further clarified that casting doubt upon the investigation as a whole, including failing to adequately investigate the case, was different than alleging a specific person was an alternate perpetrator.

After hearing argument, the district court reserved ruling on the motion. The district court then cited *Meister* and noted that unless the evidence sufficiently connected the individual to the crime, it would likely not be relevant, and ordered the defense to provide some sort of offer of proof before it engaged in questioning on that issue.

During direct examination, Det. Thorndyke testified that he interviewed other people in connection with the murder, but those interviews did not provide any useful information. He also testified that law enforcement did not receive any information that pointed to any suspects besides Emerson and, consequently, did not follow up on any other leads regarding other suspects. On cross-examination, the defense wanted to question Det. Thorndyke about two individuals: D.E. and G.J. As to D.E., the defense proffered that the reason the detective should have questioned D.E. was that "there was conversation that [D.E.'s] girlfriend and [D.E.] might have known Emerson IV or had communication with him around the time frame of the incident." The district court limited the questioning about the investigation, or lack thereof, into D.E. but Emerson was given "some leeway" to question Det. Thorndyke about D.E. The defense was permitted to question Det. Thorndyke about whether Emerson had been in contact with D.E.'s girlfriend or had been to D.E.'s residence the night before the murder. Det. Thorndyke testified that D.E. stated that he did not have access to his girlfriend's phone because he believed his girlfriend was being unfaithful. Defense counsel later asked the detective if he had questioned D.E. about his movements at the time of the murder; the State objected, and the objection was sustained. The defense also asked Det. Thorndyke if he did anything after he questioned D.E. to follow up on the investigation of D.E., and the detective indicated he had not followed up.

The defense also wished to question Det. Thorndyke as to whether G.J. had been investigated. The State objected to the line of questioning, and the district court sustained the objection. The defense requested a side bar and clarified with the district court that it wanted to follow up with questions whether Emerson was "trying to contact" G.J.'s girlfriend, whether G.J.

sent texts[6] to his girlfriend that threatened to have a hitman kill his girlfriend's new boyfriend, and whether, based on the texts and other information, G.J. was "arrested for a domestic battery between the time the warrant was issued and the arrest." The district court noted, "Okay. Maybe I'm missing something. I don't understand what that has to do with this incident." Emerson offered no additional evidence linking G.J. to the crime or explaining how G.J.'s arrest for domestic battery connected G.J. to Emerson.

Emerson argues the evidence about Det. Thorndyke's failure to follow up on plausible leads was relevant to a fact that is of consequence to the determination of the action--whether Emerson killed James. Emerson asserts that defense counsel "did not seek to point the finger at a particular third party, but sought to question whether the police neglected to pursue plausible investigative leads about third parties who might have been the real culprit." Additionally, Emerson argues the district court erred because the admissibility of the evidence should have been determined generally under the Idaho Rules of Evidence rather than the more stringent test it argues the district court applied by requiring "substantial evidence" of an alternate perpetrator before permitting the line of questioning. Finally, Emerson argues the evidence was admissible pursuant to I.R.E. 403 because the evidence was probative and would not mislead or confuse the jury. The State argues the district court did not err in excluding the evidence because the evidence was not relevant and not probative in light of the fact that Emerson provided no evidence linking what he considered plausible leads to either Emerson or the murder of James.

We first address whether the evidence was relevant. Emerson's theory of defense was that he did not commit the crime. Emerson argued to the district court that questioning the detective about failing to follow up on other plausible leads was appropriate because "the police should have done an investigation to rule out every other person who may have either had a motive, may have had means, may have had a particular modus operandi that might have impacted on this and did not follow up on any of those." We agree with Emerson that a relevant line of inquiry would be to question the scope and breadth of the investigation and to explore on cross-examination whether plausible investigative leads about third parties were ignored or overlooked. However, in this case,

---

[6] Following the hearing, the State filed a motion in limine to preclude any further mention of G.J. because the defense had not disclosed the evidence, including the texts, on which it was relying as the basis of its argument.

Emerson has not pointed to any evidence--either through an offer of proof or adduced at trial--that his line of questioning related to plausible leads and was, therefore, relevant.

For example, the defense made no proffer that Emerson was the individual with whom D.E.'s girlfriend had been unfaithful, that D.E. had any motive against Emerson or James, that D.E. had any connection whatsoever to the murder, or that D.E. had any information about James' murder. The questioning of G.J. is similarly irrelevant. No evidence was offered that Emerson or James was the new boyfriend referenced in the unadmitted text messages, and as a result, was the target of the hitman. No evidence was proffered linking G.J. to James' murder or that G.J. had any negative feelings or motives towards Emerson or James that would make the line of questioning relevant. As the *Meister* Court held:

> If the defendant proffers evidence which merely tends to mislead the jury that another person committed the crime, or the evidence is not relevant because it does not tend to make the defendant's involvement more probable or less probable, then it is within the trial court's discretion to find the evidence inadmissible. Mere inferences that another person *could* have committed the crime will most likely not be relevant, and if relevant will still be subject to the limitation provisions of I.R.E. 403. "A defendant has no right to present irrelevant evidence and even if evidence is relevant, it may be excluded in certain cases."

*Meister*, 148 Idaho at 241, 220 P.3d at 1060 (quoting *State v. Self*, 139 Idaho 718, 722, 85 P.3d 1117, 1121 (Ct. App. 2003)). Without any evidence linking D.E. or G.J. to the murder, the line of questioning would not provide evidence making it more or less likely that Emerson killed James and, therefore, was not relevant. The district court did not err in limiting this evidence.

But even if the evidence was relevant, the district court did not err in holding I.R.E. 403 prohibited the admission of the evidence. The Idaho Supreme Court has explained the weighing process that a district court must use in determining whether to admit or exclude evidence under I.R.E. 403:

> On one hand, the trial judge must measure the probative worth of the proffered evidence. The trial judge, in determining probative worth, focuses upon the degree of relevance and materiality of the evidence and the need for it on the issue on which it is to be introduced. At the other end of the equation, the trial judge must consider whether the evidence amounts to unfair prejudice. . . . Only after using this balancing test, may a trial judge use his discretion to properly admit or exclude the proffered evidence.

*Davidson v. Beco Corp.*, 114 Idaho 107, 110, 753 P.2d 1253, 1256 (1987) (citations omitted).

Emerson relies on *State v. Ruiz*, 150 Idaho 469, 248 P.3d 720 (2010) for his assertion that the district court's failure to articulate the I.R.E. 403 balancing test at the time it prohibited further

36

questioning is reversible error. We disagree. In *Ruiz*, the defendant was prohibited from cross-examining a witness about the mandatory minimum sentence the defendant would avoid in exchange for testifying against Ruiz. *Ruiz*, 150 Idaho at 471, 248 P.3d at 722. On appeal, the Idaho Supreme Court held that evidence that the witness would avoid a three-year mandatory minimum sentence in exchange for his testimony was relevant evidence under I.R.E. 401. *Ruiz*, 150 Idaho at 471, 248 P.3d at 722. The district court's analysis for excluding the evidence was as follows: "I think that the court has a delicate line to walk between what you are allowed to do in terms of credibility and the fact that the jury is not to be advised of the penalties that the defendant might face, if convicted." *Id*. The Court held that excluding the evidence without conducting the analysis required by I.R.E. 403 was error. *Ruiz*, 150 Idaho at 471, 248 P.3d at 722.

*Ruiz* requires the district court to conduct the I.R.E. 403 analysis and explain the basis for admitting or excluding the evidence. The district court did so in this case. The district court addressed whether Det. Thorndyke could be questioned about D.E. and G.J. several times during trial. Ultimately, the court found there was no evidentiary support for the line of questioning that suggested D.E. or G.J. were linked to the murder and that such questioning was speculative, relied on innuendo, was not germane or important, and did not shed any light on Emerson's guilt or innocence. Later that day, the district court explained its basis for the ruling. The district court noted it was addressing the objections that had been discussed during a sidebar. Citing "case law on the alternate perpetrator doctrine,"[7] the district court explained that "when there isn't evidence sufficient to really tie some other perpetrator to the crime in such a way as to cast doubt on the defendant's guilt, then that evidence generally would not be admissible." The district court went on to explain that his ruling was intended to be, and should be understood as, an application of I.R.E. 403. The district court held the probative value of the evidence had "scant, if any, probative value, but rather is an attempt to confuse the issues from the defendant's guilt or innocence, which is the issue in the case, into some sort of broad ranging inquiry into whether the police investigation was perfect." Thus, the district court did not fail to conduct an I.R.E. 403 analysis and it articulated its basis for excluding the evidence.

Emerson also argues the district court erred because the evidence had probative value and would not confuse the issues. We disagree. While evidence challenging the thoroughness and

---

[7]     It appears the district court was relying on *State v. Meister*, 148 Idaho 236, 220 P.3d 1055 (2009) which had been referenced by the parties in other discussions on this issue.

37

reliability of the investigation might be probative, questioning whether law enforcement investigated specific individuals with no connection to the murder provided no probative evidence. Moreover, with no connection between the evidence and the crime, there is no explanation or justification for the questioning, and it would not help the jury answer the only question in the case: whether Emerson killed James. Thus, we conclude the district court provided the required I.R.E. 403 balancing test and did not err.

Even assuming error, any error is not reversible. Error is not reversible unless it is prejudicial. *State v. Stell*, 162 Idaho 827, 830, 405 P.3d 612, 615 (Ct. App. 2017). Where a criminal defendant shows an error based on a contemporaneously objected-to, nonconstitutional violation, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt the error did not contribute to the jury's verdict. *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017). Thus, we examine whether the alleged error complained of in the present case was harmless. *See id.* Harmless error is error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. *Garcia*, 166 Idaho at 674, 462 P.3d at 1138. This standard "requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error." *Id.* If the error's effect is minimal compared to the probative force of the record establishing guilt beyond a reasonable doubt without the error, then the error did not contribute to the verdict rendered and is harmless. *Id.* The reviewing court must take into account what effect the error had, or reasonably may have had, on the jury in the context of the total setting and in relation to all else that happened, which necessarily includes the evidence presented. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

Here, the defense was not precluded from offering evidence regarding either D.E.'s or G.J.'s potential guilt but did not offer any such evidence. Moreover, the defense was permitted to question Det. Thorndyke about his failure to investigate suspects other than Emerson. For example, the defense was permitted to ask the following:

Defense:    Detective, during your investigation, did you interview or
            investigate any other people who may have had a motive to hurt
            either Emerson or anyone in the Buck household?
Det.        No.
Defense:    And so, therefore, you wouldn't have followed up on any of those?
Det.        Correct.

Defense:  Other than Mr. D.E., did you meet or interview any people who may have been jilted lovers or some other motive that they may have committed a crime of violence based on jealousy?

Det:   No.

The evidence adduced at trial indicated Norma testified that she heard Emerson shout some profanities, heard three loud thumps, and upon entering the room shared by James and Emerson, saw James bleeding to death. Blood matching James' genotype was found on Emerson's pants and socks, as was James' DNA. Emerson's wallet, cell phone, and keys were on the kitchen counter next to a knife block from which a knife was missing. Emerson had fresh cuts on his hands, consistent with his hands sliding on a bloody knife. The defense was able to elicit, and the jury heard, testimony from Det. Thorndyke that he did not follow up on any information regarding D.E., G.J., or any other potential suspect. On the other hand, no evidence was presented linking either D.E. or G.J. to James' murder. Weighing the record as a whole excluding further inquiry regarding D.E. and G.J. and comparing it against the probative force of the alleged error demonstrates the error's effect was minimal. Thus, any error limiting inquiry into D.E. and G.J. did not contribute to the verdict and was harmless.

## C. The District Court Did Not Err in Preventing Emerson from Arguing an Undisclosed Alibi

Emerson argues the district court erred when it sustained the State's objection to defense counsel's closing argument that Emerson "decided to go for a walk" on the night James was killed. Emerson argues this was not an alibi, but even if it was, he was not required to give notice of the alibi because he was not calling any witnesses in support of his claim. Further, Emerson argues the district court did not reach its decision to preclude this argument by an exercise of reason because the evidence presented supported the argument. The State argues the district court did not err in preventing Emerson's counsel from arguing facts not in evidence during closing argument, but even if the court erred, Emerson's claim fails.

During closing argument, Emerson's counsel argued:

> January 19th of last year, Emerson Buck IV, this man, he left his house, he left his mom, he left his dad, he left his uncle who has been in his nuclear family since he was ten years old. They were alive, they were well. As you can probably surmise from this, Emerson is an adult, he did what he did that night, completed his rounds, he decided to go for a walk.

The State objected on the grounds that defense counsel was arguing facts not in evidence. The district court ordered a sidebar and asked the defense to clarify its argument. The defense asserted

that its argument had as much factual support in the record as the State's theory that Emerson killed James. The district court noted that arguing that Emerson was on a walk appeared to be an alibi defense, for which the defense had not given the State any notice. The defense responded: "That's not an alibi that requires disclosure. Our defense was he was not there. Obviously, he has to be somewhere else." The State then objected to defense counsel's statement that when Emerson left his home that morning, his family was alive because there was no evidence to support that statement. The State moved for the statement to be stricken. The district court reasoned:

> Alibi is not just a third party who can say where your client was, it's also an assertion that your client was elsewhere at the time of the murder, and if you're saying all right he's not there because he's out on a walk, that is in the vein of an alibi.

Because the alibi had not been disclosed, the district court granted the motion, ordered the statements stricken from the record, and instructed the jury it could not consider the statement. The defense then rephrased the argument: "At a little after 7:30, Emerson was walking back home."

In relevant part, I.C. § 19-519 provides:

> (1)    At any time after arraignment before a magistrate upon a complaint and upon written demand of the prosecuting attorney, the defendant shall serve, within ten (10) days or at such different time as the court may direct, upon the prosecuting attorney, a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.

On appeal, Emerson argues, "The statute is not triggered where a defendant seeks to argue that he was not present at the time of the alleged offense without offering witnesses to testify in support." The first sentence of the statute explicitly requires notice of alibi be served on the State and does not condition such notice on the presence or absence of witnesses. Emerson provides no argument regarding the plain language of the first sentence of the statute or any authority that, despite the plain language of the first sentence of the statute, he need not disclose his alibi in the absence of supporting testimony. His failure to do so results in a waiver of the argument. *See State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996) (holding party waives an issue on appeal if either authority or argument is lacking).

Emerson also argues that even if he was required to disclose his alibi, the appropriate remedy was not to prohibit defense counsel from making the argument, but rather, to prohibit any

witnesses from testifying. Emerson similarly fails to provide authority for this assertion and, thus, he has waived the issue on appeal. *See id*.

Finally, Emerson argues the error was not harmless. However, since Emerson waived any claim that the district court's decision was in error, he fails to establish there was any error for us to review. Consequently, we decline to address the issue. *See id*.

**D.     Cumulative Error**

Emerson contends that the cumulative error doctrine applies here, necessitating a reversal of his conviction. Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial. *State v. Adamcik*, 152 Idaho 445, 483, 272 P.3d 417, 455 (2012). However, a necessary predicate to the application of the doctrine is a finding of more than one error. *Id*. Emerson has failed to demonstrate at least two errors, a necessary predicate to the application of the cumulative error doctrine. As a result, the cumulative error doctrine does not apply in this case.

# III.

# CONCLUSION

The district court did not err in denying Emerson's *Batson* challenge, prohibiting the admission of irrelevant evidence regarding other individuals who had no connection to the crime, or preventing Emerson from arguing an undisclosed alibi defense in closing argument when no alibi had been disclosed. The judgment of conviction is affirmed.

Chief Judge LORELLO and Judge GRATTON **CONCUR**.